ALISON B. WILSON (*Attorney-In-Charge*), *pro hac vice pending*
SEAN HENNESSY, *pro hac vice pending*
Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
awilson@cftc.gov
shennessy@cftc.gov

United States Courts
Southern District of Texas
F I L E D

JAN 3 0 2023

Nathan Ochsner, Clerk of Court

## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> MARCUS TODD BRISCO, YAS CASTELLUM LLC, YAS CASTELLUM FINANCIAL LLC, TIN QUOC TRAN, FRANCISCO STORY, FREDIRICK SAFRANKO, a/k/a TED SAFRANKO, SAEG CAPITAL GENERAL MANAGEMENT LP, and MICHAEL SHANNON SIMS, <br><br> Defendants. | Civil Case No. <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF** |

Plaintiff, Commodity Futures Trading Commission ("Commission"), by and through its attorneys, alleges as follows:

## I.   SUMMARY

1.     From at least April 2020 through the present (the "Relevant Period"), Marcus Brisco ("Brisco"), Yas Castellum LLC ("Yas 1"), Yas Castellum Financial LLC ("Yas 2"), Tin Tran ("Tran"), and Michael Sims ("Sims"), operated three interconnected fraudulent schemes in which they solicited and/or accepted funds, from individuals and entities who are not eligible contract participants ("ECPs"), as defined by Section 1a(18) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1a(18), purportedly to trade leveraged or margined retail foreign currency exchange ("forex") and leveraged or margined gold-U.S. dollar pair ("XAUUSD") transactions ("retail commodity transactions"). In fact, Yas 1, Yas 2, Brisco, and Tran did not send any funds to a firm that trades forex or XAUUSD. Instead, nearly all of the funds were directed to commodity pools controlled and operated by Tran (collectively, the "Tran Pools" and individually, "Tran-Pool 1", "Tran-Pool 2", and "Tran-Pool 3"), and Tran, Yas 2, and Brisco misappropriated a portion of the funds for other purposes.

2.     In the first of the three schemes, which operated from at least October 2020 to May 2022, Yas 1 and Brisco, the firm's CEO, fraudulently solicited prospective pool participants ("Pool Participants") to transfer funds to Yas 1 for the ostensible purpose of participating in a purported Yas 1 commodity pool. Among other things, Yas 1 and Brisco made material misrepresentations and omissions regarding where they would maintain Pool Participant funds, how they would trade with those funds, and who would do the trading. They also provided prospective Pool Participants with false information about Yas 1's historical trading profits. Based upon these material misrepresentations and omissions, at least 43 Pool Participants transferred no less than $470,780 to Yas 1 to participate in its purported commodity pool. However, Brisco did not direct any Pool

Participant funds to a firm that trades forex or XAUUSD or maintain funds in a Yas 1 commodity pool account as promised. Instead, unbeknownst to Yas 1's Pool Participants, Brisco transferred most of the Pool Participant funds to the Tran Pools and a small portion to another firm ("Purported Trading Firm 2"). Brisco did so at the direction and with the assistance of Mike Sims ("Sims"), his brother-in-law and the purported CEO of the firm that was supposed to trade on behalf of Yas 1 ("Purported Trading Firm 1"). Sims was aware that these Pool Participant funds were supposed to be used to trade forex or XAUUSD. Sims instructed Brisco to disguise the transfers as payments for "services" so the scheme would not be discovered. To further conceal the scheme, Yas 1 provided Pool Participants with false weekly account statements created by Brisco that showed their purported trading profits. In addition, Yas 1 did not set up the commodity pool or receive pool funds in the manner required by Commission Regulations.

3.      The second fraudulent scheme began in the wake of a March 2022 examination by the National Futures Association ("NFA"), which identified "serious concerns" about Yas 1's "lack of oversight and control of investor funds." In response, Brisco told the NFA that Yas 1 was ceasing operations. However, without notifying the NFA, Brisco relaunched Yas 1 as a new entity, Yas 2, and created a new purported commodity pool. Brisco told prospective Pool Participants that Yas 2 would use the same brokers, platform, and trading strategies as Yas 1. From June 2022 to present, Yas 2 and Brisco, while acting in an unregistered capacity, fraudulently solicited prospective Pool Participants using many of the same misrepresentations and omissions as Yas 1, including by falsely stating that Yas 2 would use Pool Participant funds exclusively to trade XAUUSD on a leveraged or margined basis. Based on these material misrepresentations and omissions, at least 57 Pool Participants transferred no less than $1,585,261 to participate in Yas 2's purported commodity pool. However, Yas 2 misappropriated Pool Participant funds by transferring most of the funds to Tran-Pool 3, and none were directed to a firm that trades XAUUSD. Brisco

- 3 -

also misappropriated Pool Participant funds by paying himself for purported trading profits that did not exist. Additionally, Yas 2 did not set up the commodity pool or receive pool funds in the manner required by Commission Regulations.

4.     Tran operated a third fraudulent scheme from at least April 2020 to present through which he directly accepted funds intended for trading forex or XAUUSD into one of the Tran Pools that he controlled. During the Relevant Period, Tran accepted at least $144,043,883 from no less than 913 Pool Participants at least some, if not all, of which was intended for trading forex or XAUUSD (which includes $1,448,328 transferred to the Tran Pools by Brisco for Yas 1 and Yas 2). However, Tran did not send any Pool Participant funds to a firm that trades forex or XAUUSD. Instead, he misappropriated some of the Pool Participant funds by using them to pay invoices, unrelated individuals, repay a "loan", and to subsidize his unrelated businesses. Tran also commingled pool funds with non-pool property in bank accounts that he controlled.

5.     To conceal Tran's scheme from regulators, Francisco Story ("Story") and Ted Safranko ("Safranko"), in their roles as directors and officers of SAEG Capital General Management LP ("SAEG GM"), knowingly submitted falsified bank statements to the NFA for Tran-Pool 1 accounts during an examination of SAEG GM. Safranko and Story described the Tran-Pool 1 accounts as operational accounts that contained seed capital for SAEG GM which the firm used to pay invoices. Further, they identified Tran as a business associate who helped them with the operational and organizational setup for SAEG GM, and provided seed funding to the firm. Story and Safranko altered Tran-Pool 1's bank statements to, among other things, omit more than one million dollars of deposits in Tran-Pool 1's accounts that were made for the purpose of trading forex or XAUUSD.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

6.     By virtue of this conduct and the conduct further described herein, Defendants have

engaged, are engaging, or are about to engage in acts and practices that violate the following

provisions of the Act and Commission Regulations ("Regulations"):

    a.  Yas 1 and Brisco, violations of:
        i.   7 U.S.C. §§ 6b(a)(2)(A)–(C) and 6*o*(1)(A)–(B)[1]; and
        ii.  17 C.F.R. §§ 4.20(a)(1) and (b)–(c) and 5.2(b)(1)–(3) (2022)[2];

    b.  Yas 2 and Brisco, violations of:
        i.   7 U.S.C. §§ 6b(a)(2)(A) and (C), 6*o*(1)(A)–(B), 6k(2)[3], and 6m(1)[4]; and
        ii.  17 C.F.R. § 4.20(a)(1) and (b);

    c.  Tran, violations of:
        i.   7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc)[5], 6b(a)(2)(A) and (C), 6*o*(1)(A)–(B), and 6m(1); and
        ii.  17 C.F.R. §§ 4.20(c), 5.2(b)(1) and (3), and 5.3(a)(2)[6] (2022);

    d.  Sims, violations of:
        i.   7 U.S.C. §§ 6b(a)(2)(A)–(C) and 6*o*(1)(A)–(B); and
        ii.  17 C.F.R. § 5.2(b)(1)–(3);

    e.  SAEG GM, Story, and Safranko, violations of:
        i.   7 U.S.C. § 13(a)(4)[7].

7.     At all times during the Relevant Period, the acts and omissions of Brisco were

committed within the scope of his employment, agency, or office with Yas 1 and Yas 2; and the acts

and omissions of Story and Safranko were committed within the scope of their employment,

agency, or office with SAEG GM. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C.

§ 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), Yas 1 and Yas 2 are liable as principals for

---

[1]    Sections 4b(a)(2)(A)–(C), 4*o*(1)(A)–(B) of the Act.
[2]    Regulations 4.20(a)(1), (b)–(c), and 5.2(b)(1)–(3) (2022).
[3]    Section 4k(2) of the Act.
[4]    Section 4m(1) of the Act.
[5]    Section 2(c)(2)(C)(iii)(I)(cc) of the Act.
[6]    Regulation 5.3(a)(2) (2022).
[7]    Section 9(a)(4) of the Act.

the actions and omissions of Brisco in violation of the Act; and SAEG GM is liable as a principal

for the actions and omissions of Story and Safranko in violation of the Act.

8.      At all times during the Relevant Period, Brisco was the controlling person of Yas 1

and Yas 2; and Story and Safranko were controlling persons of SAEG GM.  Therefore, pursuant to

Section 13(b) of the Act, 7 U.S.C. § 13c(b), Brisco is liable for the actions and omissions of Yas 1

and Yas 2 in violation of the Act; and Story and Safranko and are liable for the actions and

omissions of SAEG GM in violation of the Act.

9.      Unless restrained and enjoined by this Court, Defendants will likely continue to

engage in the acts and practices alleged in this Complaint, or in similar illegal acts and practices.

Accordingly, the Commission brings this action pursuant to Sections 2(c)(2)(C) and 6c of the Act,

7 U.S.C. §§ 2(c)(2)(C) and 13a-1, to enjoin Defendants' unlawful acts and practices and to compel

their compliance with the Act and the Regulations promulgated thereunder.

10.      In addition, the Commission seeks civil monetary penalties, restitution, and remedial

ancillary relief, including but not limited to, trading and registration bans, disgorgement, rescission,

pre- and post-judgment interest, and other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1,

provides that the U.S. district courts have jurisdiction to hear actions brought by the Commission

for injunctive relief or to enforce compliance with the Act whenever it shall appear to the

Commission that a person has engaged, is engaging, or is about to engage in any act or practice

constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

12.     Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C), gives the Commission jurisdiction over the forex solicitations and transactions at issue in this action and subjects those solicitations and transactions to, *inter alia*, Sections 4b and 4*o* of the Act, 7 U.S.C. §§ 6b, 6*o*. Similarly, Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) gives the Commission jurisdiction over the retail commodity solicitations and transactions at issue in this action and subjects those solicitations and transactions to, *inter alia*, 7 U.S.C. § 6b.

13.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside in, transact, or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

## III.     THE PARTIES

### A. PLAINTIFF

14.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1–26, and the Commission's Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

### B. DEFENDANTS

15.     Defendant **Marcus Todd Brisco** is a resident of Wailuku, Hawaii.  From December 4, 2020 to May 4, 2022, Brisco was registered with the Commission as an Associated Person ("AP") of Yas 1, and he was also a Principal of Yas 1.

16.     Defendant **Yas Castellum LLC** is a limited liability company that was formed in Colorado on October 21, 2020, and had a principal office in Denver, Colorado.  Brisco is the CEO and sole member of Yas 1.  From December 4, 2020 to present, Yas 1 has been registered with the Commission as a Commodity Pool Operator ("CPO"), and from March 29, 2022 to August 18,

2022, Yas 1 was listed as an approved forex firm with the NFA. Yas 1 has no other prior registration history with the Commission.

17.     Defendant **Yas Castellum Financial LLC** is a limited liability company formed in Hawaii on June 2, 2022, that has a principal office in Wailuku, Hawaii. Brisco is the CEO and manager of Yas 2. Yas 2 has never been registered with the Commission.

18.     Defendant **Tin Quoc Tran** is a resident of Katy, Texas. On March 27, 2020, Tran filed an application with NFA to be listed as a Principal of SAEG Capital Limited ("SAEG Ltd."), but he withdrew his application on April 8, 2020. SAEG Ltd. became a registrant on September 8, 2020, and the name of the registrant was later changed to SAEG Capital General Management LP. Tran has no other prior registration history with the Commission. In October 2014, Tran was convicted in a Mississippi court of felony possession of a controlled substance with intent to distribute.

19.     Defendant **Francisco Story** is a resident of Draper, Utah. From September 8, 2020 to present, Story has been registered with the Commission as an AP of SAEG GM, and from May 6, 2020 to present, Story has been a Principal of SAEG GM.

20.     Defendant **Fredirick Safranko, a/k/a Ted Safranko,** is a resident of Vancouver or Ontario, Canada. From August 7, 2020 to present, Safranko has been a Principal of the SAEG GM.

21.     Defendant **SAEG Capital General Management LP** is a limited partnership formed in Delaware on August 31, 2020, with a business address in Draper, Utah. Safranko is the CEO, Chief Compliance Officer, and a Director of SAEG GM. Story is the Investment Manager and a Director of SAEG GM. Since September 8, 2020, SAEG GM has been registered with the Commission as a CPO and listed with the NFA as an approved forex firm and swap firm. It was formerly registered under the name SAEG Ltd.

22.     Defendant **Michael Shannon Sims** is a resident of either Sunny Isles Beach, Florida

or Roswell or Atlanta, Georgia.  From January 24, 2020 to present, Sims has been a Principal of

Purported Trading Firm 1, an entity registered with the Commission as a CPO, Commodity Trading

Advisor ("CTA"), and listed with the NFA as an approved forex firm.  Sims has no other prior

registration history with the Commission.

## IV.    FACTS

### A. YAS 1'S AND BRISCO'S FRAUDULENT SCHEME

#### i.     Yas 1's and Brisco's Fraudulent Solicitation

23.     During the Relevant Period, Yas 1 marketed itself through its website as a firm that

"operates as a Commodity Pool Operator (CPO) by pooling clients['] investments into an exclusive

investment fund . . . that invests in Foreign Exchange (FOREX)."

24.     Brisco directly, and Yas 1 through the acts of Brisco, solicited prospective Pool

Participants through its website, emails, telephone calls, and by word of mouth.  To attract

additional customers, Yas 1 paid Pool Participants referral fees, ranging from $500 to $1,000,

should they bring in new customers.

25.     Yas 1 provided prospective Pool Participants with a customer agreement (the "Yas 1

PP Agreement"), which made detailed representations about where funds would be held, how funds

would be traded, and who would trade the funds.  Brisco sent the Yas 1 PP Agreement to Pool

Participants by email.  Most, if not all, Pool Participants signed the Yas 1 PP Agreement, and Brisco

countersigned as Yas 1's CEO and "CPO Account Manager."

26.     Specifically, the Yas 1 PP Agreement represented that Pool Participant funds would

be: (1) maintained in a Yas 1 commodity pool account; (2) used to "exclusively trade[] FOREX"

with a "Conservative" or "Aggressive" strategy; and (3) stated that the fund would be "brokered by"

or "monitored by" a purported third-party trading firm, which, according to at least two versions of

the agreement, was "CPO and CTA Certified since 2015". The earliest version of the Yas 1 PP Agreement, signed by one Pool Participant on November 2, 2020, stated that the fund would be "monitored by [Purported Trading Firm 2]." All subsequent Yas 1 PP Agreements signed by Pool Participants referenced Purported Trading Firm 1. The Yas 1 PP Agreement also represented that Yas 1 had historically made large profits—"10.95% ROI [Return on Investment] per month average in [the] previous 12 months" as of February 2022.

27.     According to the Yas 1 PP Agreement, the "Conservative" strategy "[t]rades FOREX (Foreign Exchange) such as USDEUR, EURAUD, EURCAD", while the "Aggressive" strategy "[t]rades FOREX but exclusively the gold standard to USD (XAUUSD)." Prior to October 2021, Yas 1 claimed that it allocated Pool Participant funds to both the "Conservative" and "Aggressive" trading strategies. From October 2021 onward, Yas 1 claimed that 100% of Pool Participant funds were allocated into the "Aggressive" strategy to trade XAUUSD.

28.     Yas 1 and Brisco represented to Pool Participants that they were trading forex and XAUUSD on a leveraged or margined basis. For example, the Yas 1 PP Agreement advised Pool Participants that Yas 1 was "trading financial instruments on margin" with a "high degree of leverage". Similarly, in an October 31, 2021 email to a Pool Participant, Brisco said the "Aggressive" strategy used "high risk/high margin trading."

29.     Yas 1 made similar representations in other solicitation materials. For example, in an email sent to prospective Pool Participants, Brisco stated that Yas 1 "collects individual investments, pools them together, and directs them to" Purported Trading Firm 1 for trading. Brisco attached Purported Trading Firm 1's NFA membership profile to this solicitation email. In another solicitation email sent to at least one prospective Pool Participant, Brisco represented that "[a]ll funds are given to my brother in laws [sic] investment company who brokers the trades exclusively in Forex (Foreign Exchange) Market."

- 10 -

30.     Brisco also distributed a promotional video to solicit Pool Participants.  In the video, Brisco identified himself as the founder of Yas 1, which he described as a "CPO entity" that provides "pooled funds" to "a private broker fund"—identified by Brisco in the distribution email as Purported Trading Firm 1—to trade Pool Participants' funds.  Brisco identified Sims as his brother-in-law and the CEO and co-founder of the "private broker fund."  The video contained an interview of Sims, which Brisco said would give Pool Participants "an idea of the caliber of person that it is going to be handling and trading your funds."  During a segment of Sims' interview, the video displayed the following caption: "The next 4 minutes describes the trader and fund that Yas Castellum participates in."  During that segment, Sims said Yas 1's trader is "on another level" and "is pushing a hundred million dollars."  The video concluded by showing purportedly live trades of XAUUSD that occurred in what Brisco claimed was "Yas Castellum's [Yas 1's] account."

31.     The statements detailed in paragraphs 25 to 30 are false.  As set forth more fully below, Yas 1 and Brisco did not:  maintain Pool Participant funds in a Yas 1 commodity pool account; transfer Pool Participant funds to any firm that trades forex or XAUUSD; and neither Purported Trading Firm 1, Purported Trading Firm 2, nor Sims made any trades for Yas 1, making it impossible for the stated ROI from trading forex or XAUUSD to be true.  Indeed, Purported Trading Firm 1 and Purported Trading Firm 2 had no trading activity for *any* customers during the Relevant Period.  Moreover, despite his repeated claims about the role of Purported Trading Firm 1, Brisco recanted these claims and admitted that Yas 1's purported commodity pool was "not an association with [Purported Trading Firm 1]."  Additionally, Yas 1 did not have a trading account at the time that Brisco distributed the promotional video and touted Yas 1's purported trading returns to prospective Pool Participants.  In fact, until approximately April 10, 2022—approximately one month after he began distributing the promotional video, and at least 16 months after he began

soliciting and accepting funds for Yas 1, Brisco only purported to maintain a personal, not a Yas 1, trading account at an off-shore trading company ("Off-Shore Trading Firm").

32.     Based upon Yas 1's and Brisco's material misrepresentations and omissions, at least 43 Pool Participants deposited approximately $470,780 into Yas 1's account for the purpose of investing in the commodity pool to trade forex or XAUUSD on a leveraged or margined basis.

33.     On information and belief, some if not all of the Yas 1 Pool Participants are not ECPs.

### ii.     Neither Brisco Nor Yas 1 Directed Funds To Any Firm That Trades Forex or XAUUSD, and Sims Aided and Abetted Brisco's and Yas 1's Fraudulent Scheme

34.     During the Relevant Period, rather than sending Pool Participants' funds to any firm that trades forex or XAUUSD, as they had represented they would, Yas 1, through the acts of Brisco, sent most of the Pool Participant funds to bank accounts of commodity pools controlled by Tran, and a small portion to Purported Trading Firm 2. Sims helped facilitate this scheme by, among other things, directing Brisco about where and how to wire funds and by instructing Brisco to disguise the transfers as payments for "services" so the scheme would not be discovered. Sims did so with knowledge that Yas 1's Pool Participant funds were intended to be used to trade forex or XAUUSD.

35.     Upon receiving Pool Participant deposits, Brisco would contact Sims by text message to tell him that he received Yas 1 Pool Participant funds intended for trading, and ask for instructions about where to wire the funds. At all times during the Relevant Period, Sims instructed Brisco about which entity and account should receive Yas 1's Pool Participant funds. During the Relevant Period, Brisco sent $394,679 received by Yas 1 to Purported Trading Firm 2 and/or the Tran Pools. As further detailed below, Brisco kept or spent the remaining Pool Participant funds.

36. Initially, upon information and belief, Sims instructed Brisco to wire Pool Participant funds to a bank account controlled by Purported Trading Firm 2. Brisco told the NFA that Purported Trading Firm 2's name referred to "the conservative approach initially used from inception until October" and that it was "managed by and through [Purported Trading Firm 1]." Similarly, Brisco told at least one Pool Participant that Purported Trading Firm 2's name was an abbreviation for Purported Trading Firm 1. Between November 18, 2020 and April 20, 2021, Yas 1, through the acts of Brisco, sent $25,000 of Pool Participant funds to Purported Trading Firm 2.

37. Thereafter, Sims directed Brisco to send Pool Participant deposits to one of the Tran Pools' bank accounts. Tran is the sole authorized signatory on all of the accounts that received Yas 1's Pool Participant funds. Sims initially directed Brisco to send funds to Tran-Pool 1's account ending in *2712 at The First bank. Between July 21, 2021 and December 6, 2021, Yas 1, through the acts of Brisco, sent $34,000 in Pool Participant funds to the Tran-Pool 1 *2712 account.

38. Subsequently, Brisco and Sims diverted Yas 1's Pool Participant funds to other Tran-controlled bank accounts. On September 3, 2021, when Brisco notified Sims that he had received another $7,000 of Pool Participant funds, Sims provided "[u]pdated instructions" that directed Brisco to send Pool Participant funds to Tran-Pool 2's *3504 account at The First bank with a memo noting payments were for "Services." Between September 8, 2021 and January 27, 2022, Yas 1 through the acts of Brisco, sent $286,179 to the Tran-Pool 2 *3504 account, at least some of which was Pool Participant funds.

39. Sims appeared to understand that these numerous Yas 1 money transfers to the various Tran Pool accounts could raise bank red flags, and he took steps to avoid bank scrutiny. For instance, on December 16, 2021, Brisco asked Sims if he could wire $5,000 in Pool Participant funds to Tran-Pool 2 and Sims responded that he could not send that amount because the "[b]anks tight on us." On February 10, 2022, Sims told Brisco that the "wire info is changing" and he

- 13 -

subsequently directed Brisco to send funds to Tran-Pool 3's *4669 account at Allegiance Bank. Sims further directed Brisco to adhere to the following instruction: "[i]n the memo or when they ask you what it's for put 'services' Nothing about investment/trading/hedge fund." Between February 24, 2022 and March 14, 2022, Yas 1, through the acts of Brisco, sent $49,500 in Pool Participant funds to the Tran-Pool 3 *4669 account.

40.     Brisco spent or kept the remaining $76,101 in Pool Participant funds that was not sent to Purported Trading Firm 2 or the Tran Pools.  For example, after March 14, 2022, which was the date of the last transfer by Yas 1 to the Tran Pools, Yas 1 received an additional $46,160 from eight Pool Participants (five of whom had no prior deposits).  None of these funds was sent to any firm that trades forex or XAUUSD, or to Purported Trading Firm 2 or the Tran Pools.  Instead, Yas 1 used the $46,160 in Pool Participant funds to, among other things, subsidize an unrelated business owned by Brisco and make a Ponzi payment to a different Pool Participant that did not deposit these funds.

41.     Yas 1 sent Pool Participants' funds to Purported Trading Firm 2 and the Tran Pools even though:  Brisco admitted that he never communicated with these entities; Yas 1 had no agreements with these entities regarding the management or trading of Pool Participant funds; and Yas 1 never told Pool Participants that their funds would be deposited with these entities. Moreover, neither Sims nor Purported Trading Firm 1—who were supposed to be trading for Yas 1—owned or controlled the entities or accounts that received Yas 1's funds.

42.     Brisco claimed to the NFA that Yas 1's Pool Participant funds ended up in a personal trading account (not a Yas 1 account) that he purportedly established at Off-Shore Trading Firm. Brisco purportedly opened the personal account at Off-Shore Trading Firm on July 24, 2021—more than 8 months after he began soliciting and receiving Pool Participant funds.  However, Yas 1 did not send any Pool Participant funds directly to Off-Shore Trading Firm.  Furthermore, Purported

Trading Firm 2 and the Tran Pools made no transfers to Off-Shore Trading Firm or any other trading firm during the Relevant Period.

43.      In addition to appearing in the promotional video that Yas 1 used to solicit Pool Participants and directing Brisco about where to send Pool Participant funds and how to disguise the transfers as payments for "services", Sims took actions to facilitate Yas 1's scheme. Sims, upon information and belief, also provided Brisco with confidential and proprietary information about Purported Trading Firm 1 that Brisco used to mislead Pool Participants into thinking that Purported Trading Firm 1 was trading funds for Yas 1. For example, Brisco distributed a "Confidential Private Placement Memorandum and Disclosure Document" (the "PPM") for a fund of Purported Trading Firm 1 as evidence of the supposed involvement of Purported Trading Firm 1 with Yas 1. The PPM stated that the fund "operate[s] as a private investment fund" that "seek[s] capital appreciation through speculative trading in . . . over-the-counter foreign currencies, or Forex, and commodity futures." The PPM identified Purported Trading Firm 1 as the "Managing Member" of the fund, and identified Sims as one of the principals. Additionally, Brisco told at least one Pool Participant that he ran Yas 1 "in conjunction with" Sims.

### iii.      Yas 1 Provided Pool Participants With False Account Statements

44.      During the Relevant Period, Yas 1, through Brisco, provided Pool Participants with falsified weekly statements showing their account balance value and purported trading returns. Each weekly statement had an individual Pool Participant's name on it. Brisco prepared these weekly statements and distributed the statements to Pool Participants by email.

45.      More than one Yas 1 Pool Participant notified Brisco that their weekly statements contained conflicting information or inaccuracies. In response, Brisco attributed these issues to clerical errors.

46.     In addition to issuing the falsified weekly statements, Brisco advised at least one Yas 1 Pool Participant in writing that his funds were making profits.

47.     The profit representations made by Yas 1 and Brisco in the weekly statements and in other oral and written communications were false.  As set forth above, there is no evidence that Yas 1 transferred Pool Participant funds to any firm that trades forex or XAUUSD.  Moreover, there were no trading accounts in Yas 1's name or in any Pool Participant's name during the period when Brisco distributed these falsified weekly statements.

48.     Based on the purported profits reflected in the weekly statements, at least one Pool Participant made an additional deposit to Yas 1's commodity pool.

### iv.     Yas 1 Did Not Operate the Commodity Pool In The Manner Required By Commission Regulations

49.     During the Relevant Period, Yas 1 did not operate the purported commodity pool as a legal entity separate from the CPO (i.e., Yas 1), it did not receive Pool Participant funds in the name of the purported commodity pool, and commingled Pool Participant funds with Yas 1's other assets.

50.     In October 2020, Brisco opened an account in the name of Yas 1 at Bank of the West, with an account number ending in *5971.

51.     As part of the Yas 1 PP Agreement, Brisco provided each Pool Participant with a "Form of Request for Deposit."  Through that document, Yas 1 instructed Pool Participants to make deposits by writing a check payable to "Yas Castellum LLC," or by wiring funds into Yas 1's *5971 account at Bank of the West.

52.     All of the Pool Participant funds that Yas 1 received during the Relevant Period were deposited into Yas 1's *5971 account.  In that account, Pool Participant funds were commingled with Yas 1's non-pool assets.

53.     In March 2022, the NFA initiated an examination of Yas 1 and Brisco. The NFA identified "serious concerns about Yas Castellum LLC's operations" and its "lack of oversight and control of investor funds."

54.     Among other things, Brisco admitted that Yas 1 did not operate the commodity pool as a separate legal entity from the CPO, it did not receive Pool Participant funds in the purported commodity pool's name, and it commingled Pool Participant funds with Yas 1's other assets.

55.     In fact, Brisco told the NFA that he would take steps "to eliminate commingling" and operate the commodity pool as a separate legal entity from the CPO. However, all of the steps taken by Yas 1 and Brisco occurred *after* Yas 1 had already received and commingled all of the Pool Participants' funds. For example, on April 8, 2022—at least 16 months after he began accepting Pool Participant funds—Brisco notified the NFA that he had just created a new entity "to separate the CPO from the Yas Castellum Pool." Shortly thereafter, Brisco attempted to open a bank account for the commodity pool entity, but the bank, upon information and belief, never opened the account.

56.     During the examination, Brisco told the NFA that he would withdraw funds and offer the right of rescission to Pool Participants. When Yas 1 received funds back that it used to repay Pool Participants, those funds did not originate from Off-Shore Trading Firm or any trading firm. Instead, the funds that Yas 1 used to repay Pool Participants were deposited in Yas 1's account by a Canadian cryptocurrency business. Yas 1 never sent funds to that Canadian cryptocurrency business.

### v.     Brisco Is a Controlling Person of Yas 1

57.     Brisco is a controlling person of Yas 1. He is the CEO and sole member of Yas 1. He executed Pool Participant agreements for Yas 1 in his capacity as CEO and "CPO Account Manager." He was personally responsible for soliciting Pool Participants for Yas 1. He was also

- 17 -

the sole source of information for Pool Participants regarding Yas 1, including information about the status of their funds.  Further, he controlled Yas 1's bank accounts into which Pool Participants transferred funds.

### vi.   Brisco Acted as an Agent for Yas 1

58.     The conduct described above, including the solicitation of prospective and existing Pool Participants, distribution of falsified account statements, and communication with Pool Participants regarding their purported trading success on behalf of Yas 1, occurred within the scope of Brisco's employment or office at Yas 1.  Accordingly, Brisco acted as an agent Yas 1.

### B.  YAS 2'S AND BRISCO'S FRAUDULENT SCHEME

#### i.   Yas 2's and Brisco's Fraudulent Solicitation

59.     On May 4, 2022, Brisco sent an email to the NFA stating that Yas 1 "is ceasing all business operations and has submitted a request for withdrawn membership from the NFA."  Brisco further stated that Yas 1 "will not be operating further from this date" and he would be "leav[ing] financial services" for another career path.

60.     On June 2, 2022, less than one month after telling the NFA that he was leaving the financial services industry, Brisco incorporated Yas 2 in Hawaii to operate a new purported commodity pool.  Brisco is the CEO and manager of Yas 2.  Brisco did not register Yas 2 with the Commission in any capacity, nor is he registered in connection with Yas 2.

61.     Contrary to his earlier statements—and without notifying the NFA of his intention to reorganize—on June 8, 2022, Brisco sent an email to prospective Pool Participants, including at least some of the Yas 1 Pool Participants, informing them that "Yas Castellum's investment fund is being reopened this week" with a new CPO, Yas 2.  Brisco claimed that Yas 2 "is not affiliated with the NFA in any[ ]way."  He further stated that "[r]egarding the trading strategies, the same Brokers,

platform, and strategies will be used as previously," and claimed that "[t]his strategy had a 32% Net ROI in April and a 26% Net ROI in May."

62.     In that same email, Brisco provided prospective Pool Participants with a new customer agreement (the "Yas 2 PP Agreement"). Brisco asked prospective Pool Participants to sign and return the Yas 2 PP Agreement and deposit funds into Yas 2's bank account. The Yas 2 PP Agreement was substantively similar to the Yas 1 PP Agreement, including with respect to where funds would be maintained, how funds would be traded, and who would trade the funds.

63.     In particular, the Yas 2 PP Agreement represented that Pool Participant funds would be: (1) maintained in a Yas 2 commodity pool account; (2) used to "exclusively [trade] the gold standard to USD (XAUUSD)"; and (3) stated that funds would be traded by "private brokers." The Yas 2 PP Agreement also advised Pool Participants that Yas 2 was "trading financial instruments on margin" with a "high degree of leverage". As set forth in detail below, these statements are false.

64.     Notably, the Yas 2 PP Agreement also represented that Yas 2 had "[e]ntered [the] aggressive account [in] July 2021" and had a "10.95% ROI [Return on Investment] per month average in [the] previous 12 months." However, Yas 2 was not formed until June 2, 2022; thus, it did not enter the aggressive account in July 2021 and it did not have any trading returns in the prior twelve months.

65.     To date, based upon Yas 2's and Brisco's material misrepresentations and omissions, at least 57 Pool Participants have deposited no less than $1,585,261 with Yas 2 for the purpose of investing in the commodity pool to trade XAUUSD on a leveraged or margined basis.

66.     On information and belief, some if not all of the Yas 2 Pool Participants are not ECPs.

### ii.   Yas 2 and Brisco Misappropriated Pool Participants' Funds

67.     During the Relevant Period, Yas 2 did not send Pool Participants' funds to any firm that trades XAUUSD or maintain those funds in a Yas 2 commodity pool account, as it had promised to do.

68.     Instead, Yas 2, through the acts of Brisco, sent $1,078,649 of the Pool Participant funds to the Tran-Pool 3 account ending in *3848 at Veritex Community Bank.  Upon information and belief, Yas 2 has no agreement with Tran-Pool 3, or any of the Tran Pools, regarding the management or trading of Pool Participant funds.

69.     Tran-Pool 3 did not direct any of the Yas 2 Pool Participant funds to a firm that trades XAUUSD.

70.     Moreover, Tran-Pool 3 itself is not a trading firm.  In fact, Tran-Pool 3's Company Agreement states that "[t]he purpose of this company is for commercial Real Estate Development."

71.     With the remaining Yas 2 Pool Participant funds that were not sent to Tran-Pool 3, Brisco paid himself amounts that exceeded what he was entitled to under the terms of the Yas 2 PP Agreement.  Among other things, the Yas 2 PP Agreement provided that Yas 2 was entitled to keep 10% of trading "Profits made through the Account."

72.     For example, on June 13, 2022, Brisco paid himself a "Profit Withdrawal" of $6,000.  However, Yas 2 had generated no trading profits at the time of this payment.  At least $5,800 of this payment originated from Yas 2's Pool Participant funds.

### iii.   Yas 2 Did Not Operate the Commodity Pool In The Manner Required By Commission Regulations

73.     During the Relevant Period, Brisco did not operate the purported commodity pool as a legal entity separate from the CPO (i.e., Yas 2), and Yas 2 did not receive funds in the name of the purported commodity pool.

- 20 -

74.     On June 2, 2022, Brisco incorporated Yas 2 in Hawaii.  Brisco did not form a separate legal entity for Yas 2's purported commodity pool at any point during the Relevant Period.

75.     On June 8, 2022, Brisco opened two bank accounts for Yas 2 at Bank of Hawaii, with account numbers ending in *5465 and *9770.  Brisco was the only authorized signatory for these accounts.  Brisco did not open an account in the name of Yas 2's purported commodity pool.

76.     The Yas 2 PP Agreement instructed Pool Participants to make deposits by writing a check payable to "Yas Castellum Financial LLC," or by wiring funds into Yas 2's account ending in *9770 at Bank of Hawaii.

77.     All of the Pool Participant funds that Yas 2 received during the Relevant Period were deposited into Yas 2's account ending in *9770 at Bank of Hawaii.

### iv.     Brisco Is a Controlling Person of Yas 2

78.     Brisco is a controlling person of Yas 2.  He is the CEO and manager of Yas 2.  He executed Pool Participant agreements for Yas 2 in his capacity as CEO and "Account Manager." He was personally responsible for soliciting Pool Participants for Yas 2.  He was also the sole source of information for Pool Participants regarding Yas 2, including information about the status of their funds.  Further, he controlled Yas 2's bank accounts into which Pool Participants transferred funds.

### v.     Brisco Is Acting as an Agent for Yas 2

79.     The conduct described above, including the solicitation of prospective and existing Pool Participants of Yas 2, and the misappropriation of Pool Participant funds, is occurring within the scope of Brisco's employment or office at Yas 2.  Accordingly, Brisco is acting as an agent Yas 2.

### C. TRAN'S FRAUDULENT SCHEME

#### i.    Tran Controlled the Affairs and Finances of the Tran Pools

80.    During the Relevant Period, Tran managed and controlled all aspects of the Tran Pools. Tran is the President, Treasurer, Director, Secretary, and member/manager of Tran-Pool 1; President, Secretary, and Treasurer of Tran-Pool 2; and Managing Member of Tran-Pool 3.

81.    In addition, Tran controlled the finances of the Tran Pools. Tran is the sole authorized signatory for all of the Tran Pools' bank accounts.

#### ii.    Tran Accepted Pool Participant Funds Into the Tran Pools' Accounts

82.    Throughout the Relevant Period, Tran accepted more than $144,043,883 million from no less than 913 Pool Participants at least some, if not all, of which was intended for trading forex or XAUUSD on a leveraged or margined basis. In addition to the funds received from Yas 1 and Yas 2, the Tran Pools directly accepted funds from Pool Participants that were deposited in Tran-controlled bank accounts for the purported purpose of trading forex or XAUUSD. The amounts accepted by Tran into the Tran Pools include the following deposits as described in paragraphs 83 to 89.

83.    The Tran Pools accepted at least $5,159,093 from no less than 19 Pool Participants in Tran-controlled bank accounts with memos that show the funds were intended for trading forex or XAUUSD. (This includes $1,448,328 transferred to the Tran Pools by Brisco for Yas 1 and Yas 2.) These 19 Pool Participants wired funds to the Tran-controlled bank accounts with memos including, among other things, "Forex", "Forex Investment", "[Pool Participant Name] Forex Fund", "FX Funds", and "Funding for FX".

84.    In or around October 2021, Sims communicated with one of these Pool Participants and instructed him to wire funds to one of the Tran-controlled bank accounts for the purpose of trading XAUUSD through a purported account at Off-Shore Trading Firm. Off-Shore Trading firm

advertised that its customers could trade forex or XAUUSD on a 1:500 leveraged basis. This Pool Participant deposited $50,000 into a Tran-Pool 2 account with a memo indicating that the funds were for "[Pool Participant's Name] Forex Acct." In May 2022, the same Pool Participant deposited an additional $50,000 intended for trading XAUUSD into a Tran-Pool 3 account with a memo indicating that the funds were for "Services for [Pool Participant Name]". As detailed above in paragraph 39, this is consistent with the instruction issued by Sims in February 2022 that wire memos should indicate Pool Participant deposits are for "services" and include "Nothing about investment/trading/hedge fund."

85.     Similarly, another Pool Participant who made multiple deposits and received funds from the Tran Pool accounts between August 2021 and February 2022 for the purpose of trading XAUUSD received the following instructions from a different individual (not Sims) before making these deposits: "*FINAL INSTRUCTIONS – SUPER IMPORTANT* Do not put anything related to FINANCE or INVESTMENTS in the description for the wire* It must be SERVICES*".

86.     In addition, the Tran Pools accepted at least $5,175,666 from no less than 39 Pool Participants with memos that show the funds were intended for trading at Off-Shore Trading Firm. These 39 Pool Participants wired funds to the Tran-controlled bank accounts with memos including, "[Off-Shore Trading Firm]", "[Off-Shore Trading Firm] Investment", "[Acronym for Off-Shore Trading Firm]", "[Acronym for Off-Shore Trading Firm] Account", "[Acronym for Off-Shore Trading Firm] Deposit", or account numbers in the format used by Off-Shore Trading Firm.

87.     Further, the Tran Pools accepted at least $127,973,799 from no less than 751 Pool Participants with memos of "services," which, as described in paragraphs 84 and 85, was an instruction provided to Pool Participants to conceal deposits that were intended for trading forex or XAUUSD.

88.     The Tran Pools also accepted at least $5,735,325 from no less than 104 Pool

Participants with memos that reference things such as "investment" or "gold".

89.     In addition to the more than $144,043,883 accepted from the at least 913 Pool
Participants, Tran also accepted into the Tran Pools an additional at least $46,168,288 from at least
524 individuals or entities for which the purpose is unknown.

90.     On information and belief, some, if not all of the Pool Participants who invested with
the Tran Pools are not ECPs.

### iii.   Tran Misappropriated Pool Participants' Funds

91.     During the Relevant Period, Tran did not send any funds to any firm that trades forex
or XAUUSD, nor did he send any funds to Off-Shore Trading Firm.  Nor did the Tran Pools
themselves engage in any trading with Pool Participant funds.

92.     Rather than using Pool Participants' funds to trade forex or XAUUSD, Tran instead
used some of the Pool Participant funds to pay invoices, unrelated individuals, and to repay a
"loan".  In addition, Tran used Pool Participant funds to subsidize his other unrelated businesses.

93.     As one example, Tran accepted $1,636,970 from a Pool Participant that deposited
funds in Tran-Pool 1's *2702 account at Home Bank for the purpose of trading forex or XAUUSD.
The wire memo on the Pool Participant's August 7, 2020 transaction said "[Pool Participant name]
Forex Fund."  Over the next twelve days, Tran used approximately $1 million of this Pool
Participant's funds to pay an unrelated individual, and another $400,000 of the funds to pay four
invoices to an unrelated business.

94.     Similarly, on May 12, 2020, Tran accepted $400,000 from a Pool Participant that
deposited funds in Tran Pool 1's *9926 account at Hancock Whitney bank.  Although this particular
deposit does not have a wire memo, this Pool Participant had previous transactions at least one of
which contained a memo that referenced "[Off-Shore Trading Firm]" and an account number in the
form used by Off-Shore Trading Firm.  On May 13, 2020, Tran used approximately $160,000 of

- 24 -

this Pool Participant's funds to pay multiple invoices.  In the following two weeks, Tran used

$140,000 more of this Pool Participant's funds to make payments to other Tran-controlled

businesses, including a hemp farm of which Tran is or was a member or owner.

95.     In yet another instance, on December 6, 2021, the Tran Pools accepted $24,000 in

Pool Participant funds from Yas 1 in Tran-Pool 1's *2712 account at The First bank.  As detailed

above, Yas 1 transferred these Pool Participant funds to Tran-Pool 1, at the direction of Sims, for

the purpose of trading XAUUSD.  Tran instead used this Pool Participant's funds to pay another

entity, with memos indicating the payments were for a "low interest loan" and as a "Wire to Close

Out Account".

96.     None of the Pool Participant funds described in paragraphs 93 to 95 were sent to a

firm that trades forex or XAUUSD.

97.     To the extent that some Pool Participants have received funds back from the Tran

Pools, those funds did not originate from any firm that trades forex or XAUUSD.

### iv.   Tran Did Not Operate the Tran Pools In The Manner Required By Commission Regulations

98.     During the Relevant Period, Tran accepted Pool Participant funds in Tran-controlled

bank accounts that contained non-pool property, including funds obtained from third parties that are

not Pool Participants.  By doing so, Tran commingled pool property with non-pool property.

### D. SAEG GM, STORY, AND SAFRANKO SUBMITTED FALSE STATEMENTS TO THE NFA

#### i.   False Statements to the NFA

99.     To conceal Tran's scheme from regulators, Story and Safranko, in their roles as

directors and officers of SAEG GM, knowingly submitted falsified bank statements to the NFA for

Tran-Pool 1 accounts during an examination of SAEG GM.  Safranko and Story described the Tran-

Pool 1 accounts as operational accounts that contained seed capital for SAEG GM which the firm

used to pay invoices.  Further, they identified Tran as a business associate who helped them with the

operational and organizational setup for SAEG GM, and provided funding to the firm. As detailed below, Story and Safranko altered Tran-Pool 1's bank statements to, among other things, omit more than one million dollars of deposits in Tran-Pool 1's accounts that were made for the purpose of trading forex or XAUUSD.

100.    On July 12, 2021, the NFA initiated an examination of SAEG GM, a registered CPO and approved forex and swap firm. The NFA initially contacted and spoke to Story, who is registered as an associated person ("AP") of SAEG GM, on July 12, 2021. The NFA requested documentation from SAEG GM including, among other things, bank statements and wire transfer documents for all of the firm's accounts, whether in its own name or under any affiliated entities.

101.    On July 13, 2021, in response to a request from the NFA, SAEG GM identified Safranko and Story as the "Directors/Partners" of the firm, and Story as the AP of SAEG GM. In that same response, SAEG GM identified and described the purpose of bank accounts in the names of SAEG GM and two affiliated entities. SAEG GM initially produced the NFA requested bank records for these three entities. The NFA reviewed these bank statements and identified transactions between SAEG GM and Tran-Pool 1.

102.    In an email to the NFA on July 18, 2021, Story identified Safranko as his "partner" and SAEG GM's Chief Compliance Officer.

103.    Throughout the examination, Story and Safranko communicated with the NFA by email, video, and telephone. Story uploaded all of the documents produced by SAEG GM in response to the NFA's requests via the NFA's document portal.

104.    On July 19, 2021, Story and Safranko participated in a video conference with the NFA to discuss SAEG GM's operations, the NFA's document requests, and to answer questions about the firm. Following the call, the NFA sent an updated request for bank account records for Tran-Pool 1.

105.     On July 21, 2021, Safranko spoke to the NFA by telephone about the NFA's document requests, and he indicated that the production of the Tran-Pool 1 bank statements would be made that afternoon.

106.     Story, on behalf of SAEG GM, produced statements for accounts maintained at three banks by Tran-Pool 1.  Story stated that these "were operational accounts where our invoices were paid and where we had deposits of seed capital from a partner in the firm Ted (Fredirick) Safranko as well as Tin Tran who originally applied for the NFA registration but we ultimately removed him from the registration as he did not have the time to commit to the organization but did a lot of operational and organizational structural setup for the firm in the beginning."  SAEG GM subsequently produced wire transaction documents for these three accounts.

107.     Story and Safranko directly, and SAEG GM through the acts of Story and Safranko, falsified the Tran-Pool 1 bank statements that SAEG GM submitted to the NFA to conceal, among other things, deposits in these accounts that were intended for trading of forex or XAUUSD.

108.     The statements that Story and Safranko produced on behalf of SAEG GM to the NFA do not match the bank-certified copies of these statements.

109.     For example, the bank-certified statements for Tran-Pool 1's *9926 at Hancock Whitney bank showed a total of $813,432.88 in deposits and withdrawals, while the amounts shown on the falsified statements produced by SAEG GM to the NFA showed only $80,100 deposited and withdrawn, which was less than 10% of the true amount.  Similarly, the statements produced by SAEG GM for Tran-Pool 1's *9926 account showed only five deposit transactions while the bank-certified statements showed 12 deposits.  One difference, for example, was that SAEG GM omitted a Pool Participant's deposits totaling $44,975, one of which included a memo of "FX Funds".

110.     The discrepancies were even greater between the bank-certified statements and the falsified statements submitted by SAEG GM for the other two accounts.  For Tran-Pool 1's *2702

account at Home Bank, the bank-certified statements showed 14 deposit and 84 withdrawal transactions, each totaling approximately $4.6 million, but the SAEG GM-generated statements showed only one deposit and 13 withdrawals for a total of only $50,000 each—which is approximately 1% of the true amount. Moreover, the only deposit transaction that appeared in the SAEG GM-generated statements was fictitious. Specifically, the SAEG GM-generated statements showed an incoming wire for $50,000 from Tran on July 2, 2020 as the initial transaction for the account. In fact, the initial transaction was a $420,000 incoming wire from Purported Trading Firm 2, which was omitted from the SAEG GM-generated statements. Similarly, the SAEG GM-generated statements omitted additional Pool Participant transactions including, among others, two Pool Participant deposits in August 2020 total $1,636,970, one of which had a memo of "[Pool Participant's Initials] Forex Fund".

111. Likewise, the SAEG GM-generated statements for Tran-Pool 1's *2712 account at The First bank showed only four deposits for a total of $116,100, whereas the bank-certified statements showed numerous deposits totaling more than $7.6 million. Among the transactions omitted from the SAEG GM-generated statements were four deposits from three individuals or entities containing the words "invest" or "investment", and five deposits from four individuals that contained memos including the word "services". Also omitted from the SAEG GM-generated statements were two transactions with memos referencing Off-Shore Trading Firm, and five transactions with or referencing Purported Trading Firm 2. The SAEG GM-generated statements also omitted all transactions for February and May 2021.

112.    In addition to the millions of dollars in omitted transactions, the SAEG GM-generated statements produced to the NFA contained other signs of forgery, including spacing inconsistencies, misalignments of text, and non-matching logos.

### ii.    Story and Safranko Are Controlling Persons of SAEG GM

113.    Story and Safranko are controlling persons of SAEG GM.  At all times during the Relevant Period, Safranko was the CEO, Chief Compliance Officer, and a Director of SAEG GM. At all times during the Relevant Period, Story was the Investment Manager and a Director of SAEG GM.  In addition, Story and Safranko were co-owners of SAEG GM with two other unnamed individuals.  Moreover, as detailed above, they were personally involved in communications with the NFA during the examination, and in the preparation and submission of the falsified documents.

### iii.    Story and Safranko Are Acting as Agents for SAEG GM

114.    Through their communications with the NFA and the production of documents to the NFA on behalf of SAEG GM, Story and Safranko are acting as agents of SAEG GM.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE
**Violations of 7 U.S.C. § 6b(a)(2)(A)–(C)[8] and 17 C.F.R. § 5.2(b)(1)–(3) (2022)[9]**
**(Against Defendants Yas 1 and Brisco)**

**Violations of 7 U.S.C. § 6b(a)(2)(A) and (C)**
**(Against Defendants Yas 2 and Brisco)**

**Violations of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3)**
**(Against Defendant Tran)**

**Fraud in Connection with Retail Forex and Retail Commodity Transactions**

115.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

---

[8]     Section 4b(a)(2)(A)–(C) of the Act.
[9]     Regulation 5.2(b)(1)-(3).

116.    7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

> (2)     for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

>> (A)   to cheat or defraud or attempt to cheat or defraud the other person;

>> (B)   willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

>> (C)   willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

117.    Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

118.    Section 1a(18)(A)(iv) of the Act, 7 U.S.C. § 1a(18)(iv), defines an ECP to include a commodity pool that has assets exceeding $5,000,000 and "is formed and operated by a person subject to regulation under this chapter or a foreign person performing a similar role or function subject as such to foreign regulation (regardless of whether each investor in the commodity pool or the foreign person is itself an eligible contract participant) provided, however, that for purposes of section 2(c)(2)(B)(vi) of this title and section 2(c)(2)(C)(vii) of this title, the term 'eligible contract participant' shall not include a commodity pool in which any participant is not otherwise an eligible contract participant."

119.    On information and belief, some, if not all of the Pool Participants who invested in the Yas 1 and Yas 2 commodity pools are not ECPs.

120.    On information and belief, some, if not all of the Pool Participants who invested in the Tran Pools are not ECPs.

121.    Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex "shall be subject to . . . [7 U.S.C. §] 6b," except in circumstances not relevant here.  Moreover, under 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to forex transactions described herein "as if" they were a contract of sale of a commodity for future delivery because they were "offered to, or entered into with, a person that is not an" ECP. Pursuant to 7 U.S.C. § 2(c)(2)(C)(vii), "[t]his Act applies to, and the Commission shall have jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades," forex agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i).

122.    Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), retail commodity transactions, including the XAUUSD transactions described herein, are subject to 7 U.S.C. § 6b, as if they are contracts of sale of a commodity for future delivery.

123.    17 C.F.R. § 5.2(b) (2022) provides, in relevant part, that:

It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:

(1)  To cheat or defraud or attempt to cheat or defraud any person;

(2)  Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or

(3)  Willfully to deceive or attempt to deceive any person by any means whatsoever.

124.    During the Relevant Period, Yas 1 and Brisco, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail forex

- 31 -

transactions and retail commodity transactions, willfully or recklessly: (1) cheated or defrauded, or attempted to cheat or defraud, other persons, (2) made or caused to be made false reports or statements to other persons, and/or (3) deceived or attempted to deceived other persons. Yas 1 and Brisco did so by making material misrepresentations and omissions with scienter regarding, among other things, where Pool Participant funds would be maintained, how funds would be traded, who would do the trading, and by claiming that Yas 1 had made historically large trading profits. Yas 1 and Brisco also provided Pool Participants with false weekly account statements.

125.    By reason of the foregoing, Yas 1 and Brisco violated 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) (2022).

126.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Brisco's employment or office with Yas 1. Therefore, Yas 1 is liable for his acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) (2022), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), as principal for its agent's acts, omissions or failures of the Act and Regulations.

127.    Throughout the Relevant Period, Brisco controlled Yas 1, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Yas 1's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Brisco is liable for Yas 1's violations of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) (2022).

128.    During the Relevant Period, Yas 2 and Brisco, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail commodity transactions, willfully or recklessly: (1) cheated or defrauded, or attempted to cheat or defraud, other persons, and/or (2) deceived or attempted to deceived other persons. Yas 2 and

Brisco did so by making material misrepresentations and omissions with scienter regarding, among other things, where Pool Participant funds would be maintained, how funds would be traded, who would do the trading, and by claiming that Yas 2 had made historically large trading profits.  Yas 2 and Brisco also misappropriated Pool Participant funds provided in connection with retail commodity transactions.

129.    By reason of the foregoing, Yas 2 and Brisco violated 7 U.S.C. § 6b(a)(2)(A) and (C).

130.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Brisco's employment or office with Yas 2.  Therefore, Yas 2 is liable for his acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A) and (C), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), as principal for its agent's acts, omissions or failures of the Act and Regulations.

131.    Throughout the Relevant Period, Brisco controlled Yas 2, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Yas 2's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Brisco  is liable for Yas 2's violations of 7 U.S.C. § 6b(a)(2)(A) and (C).

132.    During the Relevant Period, Tran, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail forex transactions and/or retail commodity transactions, willfully or recklessly:  (1) cheated or defrauded, or attempted to cheat or defraud, other persons, and/or (2) deceived or attempted to deceived other persons.  Tran did so by misappropriating Pool Participant funds provided in connection with retail forex transactions and/or retail commodity transactions.

133.    By reason of the foregoing, Tran violated 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3) (2022).

134.    For each Defendant named in this charge, each misappropriation, misrepresentation and omission of material fact, and false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) (2022).

### COUNT TWO
**Violations of 7 U.S.C. § 6o(1)(A)–(B)[10]**
**(Against Defendants Yas 1, Yas 2, Brisco, and Tran)**

**Fraud and Deceit by CPOs and an AP of CPOs**

135.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

136.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
>
> > (I) commodity for future delivery, security futures product, or swap; [or]
> >
> > (II) agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection 2(c)(2)(D)(i) [of the Act].

137.    For the purposes of retail forex transactions, a CPO is defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2022), as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP, as defined in 17 U.S.C. § 1a(18), and that engages in retail forex transactions.

---

[10]    Section 4o(1)(A)–(B) of the Act.

138.    Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in

retail forex and accounts or pooled investment vehicles in retail forex "shall be subject to . . .

[7 U.S.C. §] 6o," except in circumstances not relevant here.

139.    Regulation 1.3, 17 C.F.R. § 1.3 (2022), defines an AP of a CPO as any natural

person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any
> natural person occupying a similar status or performing similar functions),
> in any capacity which involves (i) the solicitation of funds, securities, or
> property for a participation in a commodity pool or (ii) the supervision of
> any person or persons so engaged[.]

140.    Pursuant to 17 C.F.R. § 5.1(d)(2) (2022), any person associated with a CPO "as a

partner, officer, employee, consultant or agent (or any natural person occupying a similar status or

performing similar functions), in any capacity which involves:  (i) [t]he solicitation of funds,

securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision of

any person or persons so engaged" is an AP of a CPO.

141.    7 U.S.C. § 1a(18)(A)(xi) defines an ECP, in relevant part, as an individual who has

amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or

$5 million if the individual enters into the transaction to manage the risk associated with an asset

owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

142.    7 U.S.C. § 1a(18)(iv) defines an ECP to include a commodity pool that has assets

exceeding $5,000,000 and "is formed and operated by a person subject to regulation under this

chapter or a foreign person performing a similar role or function subject as such to foreign

regulation (regardless of whether each investor in the commodity pool or the foreign person is itself

an eligible contract participant) provided, however, that for purposes of section 2(c)(2)(B)(vi) of

this title and section 2(c)(2)(C)(vii) of this title, the term 'eligible contract participant' shall not

include a commodity pool in which any participant is not otherwise an eligible contract participant."

143.    On information and belief, some, if not all of the Pool Participants who invested in the Yas 1 and Yas 2 commodity pools are not ECPs.

144.    On information and belief, some, if not all of the Pool Participants who invested in the Tran Pools are not ECPs.

145.    During the Relevant Period, Yas 1 solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in retail forex transactions (as described in 7 U.S.C. § 2(c)(2)(C)(i)) and retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Yas 1 is acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II) and 17 C.F.R. § 5.1(d)(1) (2022).

146.    During the Relevant Period, Yas 2 solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Yas 2 is acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

147.    During the Relevant Period, Brisco was associated with Yas 1 and Yas 2, both CPOs, as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool.  Therefore, Brisco was an AP of a CPO as defined by 17 C.F.R. § 1.3 (2022) and 17 C.F.R. § 5.1(d)(2) (2022).

148.    During the Relevant Period, Tran accepted funds, securities, or property for pooled investment vehicles for the purpose of trading in retail forex transactions (as described in 7 U.S.C. §2(c)(2)(C)(i)) and/or retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Tran is acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II) and17 C.F.R. § 5.1(d)(1) (2022).

149.    7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce,

directly or indirectly, from "(A) . . . employ[ing] any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) . . . engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

150.    During the Relevant Period, Yas 1, while acting as a registered CPO, through Brisco, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, making material misrepresentations and omissions with scienter; and by issuing false weekly account statements to Pool Participants.

151.    During the Relevant Period, Yas 2, while acting as an unregistered CPO, through Brisco, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, making material misrepresentations and omissions with scienter; and by misappropriating Pool Participant funds.

152.    Yas 1, Yas 2, and Brisco committed the acts and practices described herein willfully, or with reckless disregard for the truth.

153.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Brisco's employment or office with Yas 1 and Yas 2.  Therefore, Yas 1 and Yas 2 are liable for his acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and (B), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), as principals for its agent's acts, omissions or failures of the Act and Regulations.

154.    Brisco controls Yas 1 and Yas 2, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Yas 1's and Yas 2's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Brisco is liable for Yas 1's and Yas 2's violations of 7 U.S.C. § 6o(1)(A) and (B).

155.   During the Relevant Period, Tran, while acting as an unregistered CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating Pool Participant funds.

156.   Tran, committed the acts and practices described herein willfully, or with reckless disregard for the truth.

157.   For each Defendant named in this charge, each misappropriation, misrepresentation and omission of material fact, and false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6o(1)(A) and (B).

### COUNT THREE
**Violations of 7 U.S.C. §§ 6b(a)(2)(A)–(C) and § 6o(1)(A)–(B), and
17 C.F.R. § 5.2(b)(1)–(3) (2022)
(Against Defendant Sims)**

**Aiding and Abetting Yas 1's and Brisco's Violations**

158.   Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

159.   Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides that:

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

160.   As alleged above, Yas 1 and Brisco made material misrepresentations and omissions with scienter regarding, among other things, where Pool Participant funds would be maintained, how funds would be traded, who would do the trading, and by claiming that Yas 1 had made historically large trading profits.  Yas 1 and Brisco also provided Pool Participants with false weekly account statements.  Through this conduct, Yas 1 and Brisco violated 7 U.S.C. §§ 6b(a)(2)(A)–(C), 6o(1)(A)–(B), and 17 C.F.R. § 5.2(b)(1)–(3).

- 38 -

161.    By, among other things:  providing Yas 1 with confidential and proprietary documents and information about Purported Trading Firm 1 knowing that Yas 1 would use that information to solicit Pool Participants in connection with retail forex and retail commodity transactions, knowingly directing Yas 1 to transfer Pool Participant funds to entities that he knew or should have known would not send funds to any trading firm, and by instructing Brisco to disguise the transfers as payments for "services" so the scheme would not be discovered, Sims willfully aided and abetted Yas 1's and Brisco's violations of 7 U.S.C. § 6b(a)(2)(A)–(C), 6o(1)(A)–(B), and 17 C.F.R. § 5.2(b)(1)–(3), and acted in combination or concert with Yas 1 and Brisco in the commission thereof.

162.    Therefore, pursuant to 7 U.S.C. § 13c(a), Sims is responsible, as if he was a principal, for each violation of 7 U.S.C. §§ 6b(a)(2)(A)–(C) and 6o(1)(A)–(B), and 17 C.F.R. § 5.2(b)(1)–(3) committed by Yas 1 and Brisco.

**COUNT FOUR**
**Violations of 7 U.S.C. §§ 6k(2) and 6m(1)[11]**
**(Against Defendants Yas 2, Brisco)**

**Violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) [12] and 6m(1),**
**and**
**17 C.F.R. § 5.3(a)(2) (2022)[13]**
**(Against Defendant Tran)**

**Failure To Register as a CPO and as an AP of a CPO**

163.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

164.    7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds,

---

[11]    Sections 4k(2) and 4m(1) of the Act.
[12]    Section 2(c)(2)(C)(iii)(I)(cc) of the Act.
[13]    Regulation 5.3(a)(2).

securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

    i.  commodity for future delivery, security futures product, or swap; [or]

    ii.  agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection 2(c)(2)(D)(i) [of the Act.]

165.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

166.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2)(i) makes it unlawful for any person to be associated with a CPO as a "partner, officer, employee, consultant or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) solicitation of funds, securities, or property for a participation in a commodity pool . . . unless such person is registered with the Commission" as an AP of the CPO.

167.    7 U.S.C. § 6k(2) also prohibits a CPO from permitting "such a person to become or remain associated with" it, in any such capacity, if the CPO knew or should have known that such person was not registered as an AP.

168.    Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states that a

[P]erson, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 21 of this title, shall not—

    . . . .

(cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [retail forex agreements, contracts, or transactions].

169.   For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) (2022), as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP, as defined in 17 U.S.C. § 1a(18), and that engages in retail forex transactions.

170.   Except in circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(i) (2022) requires those that meet the definition of CPO under 17 C.F.R. § 5.1(d) (2022) to register as a CPO with the Commission.

171.   For the purposes of retail forex transactions, an AP of a CPO is defined in 17 C.F.R. § 5.1(d)(2) (2022) as any natural person associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions) in any capacity that involves soliciting funds, securities or property for participation in a pooled investment vehicle or supervising persons so engaged.

172.   Except in certain circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(ii) (2022) requires those that meet the definition of an AP of a CPO under 17 C.FR. § 5.1(d) (2022) to register with the Commission.

173.   During the Relevant Period, Yas 2 operated or solicited funds, securities, or property for a pooled investment vehicle from pool participants for the purpose of trading in retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); thus, Yas 2 is acting as a CPO as defined by 7 U.S.C. § 1a(11).

174.   Yas 2, while using the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO, is not registered with the Commission as a CPO, in violation of 7 U.S.C. § 6m(1).

175.   During the Relevant Period, Brisco associated with Yas 2 as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar

functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, Brisco acted as an AP of a CPO as defined by 7 U.S.C. § 6k(2)(i).

176.    Brisco is not registered with the Commission as an AP of Yas 2; thus, Brisco acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2)(i).

177.    Yas 2 supervised Brisco and permitted him to solicit Pool Participants for the commodity pool knowing that he was unregistered, in violation of 7 U.S.C. § 6k(2).

178.    The foregoing acts, omissions, and failures occurred within the scope of Brisco's employment or office with Yas 2.  Therefore, Yas 2 is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 6k(2) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), as principal for its agent's acts, omissions or failures of the Act and Regulations.

179.    Brisco controls Yas 2, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Yas 2's conduct alleged in this Count.  Therefore, Brisco is also liable for Yas 2's violations of 7 U.S.C. §§ 6k(2) and 6m(1) pursuant to 7 U.S.C. 13c(b).

180.    During the Relevant Period, Tran operated or accepted funds, securities, or property for a pooled investment vehicle from pool participants who were not ECPs, as defined by 7 U.S.C. § 1a(18), for the purpose of trading in retail forex transactions (as described in 7 U.S.C. § U.S.C. § 2(c)(2)(C)(i)) and/or retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); thus, Tran is acting as a CPO as defined by 7 U.S.C. § 1a(11) and 17 C.F.R. § 5.1(d)(1) (2022).

181.    Tran, while using the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO, is not registered with the Commission as a CPO, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2022).

182.    Each instance that Yas 2 and Tran acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

183.    Each instance that Brisco acted as an AP of Yas 2, a CPO, but failed to register with the Commission as such is alleged as a separate and distinct violation.

**COUNT FIVE**
**Violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2022)[14]**
**(Against Defendants Yas 1, Yas 2, Brisco, and Tran)**

**Failure To Operate Pool as Separate Entity; Failure To Receive Pool Participant Funds in Pool's Name; Commingling of Pool Funds**

184.    Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

185.    Regulation 5.4, 17 C.F.R. § 5.4 (2022), states that 17 C.F.R. Pt. 4 applies to any person required to register as a CPO pursuant to 17 C.F.R. pt. 5 (2022).

186.    17 C.F.R. § 4.20(a)(1) (2022) requires a CPO, whether registered or not, to operate its commodity pool as a legal entity separate from that of the CPO.

187.    17 C.F.R. § 4.20(b) (2022) prohibits a CPO, whether registered or not, from receiving pool funds in any name other than that of the pool.

188.    17 C.F.R. § 4.20(c) (2022) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

189.    During the Relevant Period, Yas 1, while registered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2022) by: failing to operate the commodity pool as a legal entity separate from Yas 1; failing to receive Pool Participant funds in the pool's name; and commingling Pool Participants' funds with Yas 1's non-pool assets.

190.    During the Relevant Period, Yas 2, while unregistered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1) and (b) (2022) by: failing to operate the commodity pool as a legal entity separate from Yas 2; and failing to receive Pool Participant funds in the pool's name.

191.    The foregoing acts and failures occurred within the scope of Brisco's employment or

---

[14]    Regulation 4.20(a)(1), (b)–(c).

office with Yas 1 and Yas 2. Therefore, Yas 1 and Yas 2 are liable for his acts and failures in violation of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2022), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), as principals for its agent's acts, omissions or failures of the Act and Regulations.

192.     Throughout the Relevant Period, Brisco controlled Yas 1 and Yas 2, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Yas 1's and Yas 2's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Brisco is liable for Yas 1's and Yas 2's violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2022).

193.     During the Relevant Period, Tran, while unregistered and acting as a CPO, violated 17 C.F.R. § 4.20(c) (2022) by commingling Pool Participants' funds with Tran's non-pool assets.

194.     For each Defendant named in this charge, each act of failing to operate a pool as a legal entity separate from that of the CPO, improperly receiving pool participants' funds, and commingling the property of the pool with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2022).

## COUNT SIX
### Violations of 7 U.S.C. § 13(a)(4)[15]
### (Against Defendants SAEG GM, Story, and Safranko)

### Willful Submission of False or Misleading Information to a Futures Association

195.     Paragraphs 1 through 114 are re-alleged and incorporated herein by reference.

196.     7 U.S.C. § 13(a)(4) provides, in pertinent part, that "It shall be a felony punishable by a fine of not more than $1,000,000 or imprisonment for not more than 10 years, or both, together with the costs of prosecution, for . . .

> (4) Any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent

---

[15]     Section 9(a)(4) of the Act.

> statements or representations, or make or use any false writing or
> document knowing the same to contain any false, fictitious, or fraudulent
> statement or entry to a . . . futures association designated or registered
> under this Act acting in furtherance of its official duties under this Act.

197.   SAEG GM, Story, and Safranko coordinated to willfully submit numerous materially false documents to the NFA, a futures association designated or registered under the Act, during the course of an examination in furtherance of its official duties.  These materially false documents included, but were not limited to, falsified bank account statements.

198.   By reason of the foregoing, SAEG GM, Story, and Safranko violated of 7 U.S.C. § 13(a)(4).

199.   The foregoing acts of submitting materially false documents and statements to the NFA occurred within the scope Story's and Safranko's employment or office for SAEG GM. Therefore, SAEG GM is liable for Story's and Safranko's, violations of 7 U.S.C. § 13(a)(4), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), as principal for its agent's acts, omissions or failures of the Act and Regulations.

200.   Throughout the Relevant Period, Story and Safranko controlled SAEG GM directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SAEG GM's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Story and Safranko are liable for SAEG GM's violations of 7 U.S.C. § 13(a)(4).

201.   For each Defendant named in this charge, each act of submitting materially false documents and statements to the NFA, is alleged as a separate and distinct violation of 7 U.S.C. § 13(a)(4).

## VI.   **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.   Find that Defendants violated Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)–(C), 4k(2),

4m(1), 4*o*(1)(A)–(B), and 9(a)(4) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)–(C),

6k(2), 6m(1), 6*o*(1)(A)–(B), and 13(a)(4), and Regulations 4.20(a)(1), (b)–(c), 5.2(b)(1)–(3), and

5.3(a)(2) (2022), 17 C.F.R. §§ 4.20(a)(1), (b)–(c), 5.2(b)(1)–(3), and 5.3(a)(2) (2022);

      B.     Enter an order of permanent injunction permanently restraining, enjoining, and

prohibiting Defendants, and any other person or entity associated with them, from engaging in

conduct described above, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)–(C), 6k(2),

6m(1), 6*o*(1)(A)–(B), and 13(a)(4), and 17 C.F.R. §§ 4.20(a)(1), (b)–(c), 5.2(b)(1)–(3), and 5.3(a)(2)

(2022);

      C.     Enter an order of permanent injunction permanently restraining, enjoining, and

prohibiting Defendants, and their affiliates, agents, servants, employees, assigns, attorneys, and all

persons in active concert with them, from directly or indirectly:

      1)   Trading on or subject to the rules of any registered entity (as that term is defined by

           Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

      2)   Entering into any transactions involving "commodity interests" (as that term is

           defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for accounts held in the name of

           any Defendant or for accounts in which any Defendant has a direct or indirect

           interest;

      3)   Having any commodity interests traded on any Defendants' behalf;

      4)   Controlling or directing the trading for or on behalf of any other person or entity,

           whether by power of attorney or otherwise, in any account involving commodity

           interests;

      5)   Soliciting, receiving, or accepting any funds from any person for the purpose of

           purchasing or selling of any commodity interests;

      6)   Applying for registration or claiming exemption from registration with the

- 46 -

Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

7)   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

D.      Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.      Enter an order requiring Defendants as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.      Enter an order directing Defendants as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the pool participants whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

G.      Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat. 584, 599–600, *see* 17 C.F.R. § 143.8 (2022), for

each violation of the Act and Regulations, as described herein;

     H.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920, 2413(a)(2); and

     I.     Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Dated:  January 30, 2023     Respectfully submitted,

     COMMODITY FUTURES
     TRADING COMMISSION

     /s/ Alison B. Wilson
     ALISON B. WILSON (D.C. Bar 475992), *pro hac vice pending*
     *(Attorney-In-Charge)*
     SEAN HENNESSY (D.C. Bar 1011564), *pro hac vice pending*
     Attorneys for Plaintiff
     COMMODITY FUTURES
     TRADING COMMISSION
     1155 21st Street, N.W.
     Washington, D.C. 20581
     Telephone: (202) 418-5000
     awilson@cftc.gov
     shennessy@cftc.gov

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF